Good morning. Good morning. May it please the Court, Benjamin Hayes for the appellants. If I could, I'd like to reserve four minutes for rebuttal. Keep your voice up, would you, Mr. Hayes? Yes, please. Yes, I will. This case involves a straightforward question of statutory interpretation. 8 U.S.C. § 1225A deems all aliens who are present in the United States without admission or who arrive in the United States to be applicants for admission. And § 1225B2A provides that all such applicants for admission shall be detained pending their removal proceedings. And as the Fifth Circuit held just last month, the statute mandates detention without bond for any alien who cannot show that they are entitled to be admitted, and that is true regardless of how long they are present in the country unlawfully. Now, petitioner's contrary interpretation of the statute is not only at war with the statute's text, but it would reimpose the same perverse regime that Congress sought to discard when it adopted ERIRA and § 1225 in 1996, a regime in which aliens who intentionally violate law are given preferential treatment in the form, in this case, of bond hearings, while those who enter the United States in accordance with law presenting at a port of entry are subject to mandatory detention. Well, you suggest that this is an easy answer, but I don't, you know, we do also have a very detailed dissent from the Fifth Circuit, so we're here anew to take a look at this. And by my count, there's at least three Supreme Court decisions that use this language seeking admission in the way that the plaintiff class is using here. So, I'm having trouble wondering, how do we discard Jennings, which is as recent as 2018, Lengmeimei, 1958, and Landon v. Plasencia in 1982, and they distinguish between an alien already physically present and one outside or at the border or on a ship seeking admission. Do we just disregard those Supreme Court cases? So, I think the first two are talking more about the, certainly are not interpreting this statute, but I think referring to the entry fiction. In terms of Jennings, which is, as you say, the case that is most contemporary and one that they rely on, I don't think it's a matter of disregarding Jennings. I think the point is that Jennings just did not decide this question. Well, of course they didn't decide the question. They were looking at the whole issue of timing and a whole different question, but the court is quite clear there where they say, 1225B covers aliens seeking to enter the country at the nation's borders and ports, and section 1226 provides the rule for aliens already in the country, and that's the language we see repeated in these Supreme Court cases, this distinction between 1225 and 1226, and you're just saying disregard that because that's not the exact question that was decided? It's not that it wasn't just the exact question not being decided. It's not even related to it, right? The question that the Supreme Court was answering in Jennings was whether 1225 and 1226 can be read using the canon of constitutional avoidance to be read to have a statutory right to a bond hearing, so whether they mandate detention or whether there's a safety valve that can be read into them, and that is the only thing that the Supreme Court was addressing there. The language that Your Honor is referring to isn't part of that analysis, so it's not the kind of persuasive dicta that's kind of wrapped up in the analysis. The difficulty is that we have history going back to 1958 where they say, well, the laws have always distinguished between those seeking admission, that's the key phrase here, and those that are already here, whether they be here lawfully or unlawfully. Then we have 30 years of practice where that's always been the case up until just now. So on that point, do we give any credit to the fact that for 30 years this has been the practice, the exact practice of, well, I'll call it the INS for short terms, and the fact that just recently totally jettisoned that position and has gone the opposite way? Is there anything to be made of those circumstances? So I think there are a couple things there. First, with respect to this, I believe Your Honor referred to a line differentiating between entry and those already present. I think that's a line that Congress, through the definition of applicant for admission, was trying to obliterate. What they were trying to do was to put everyone who is entering and present in the country on equal footing. That's what that definition does. So I think going back to 1952, et cetera, I think that ERIRA through 1225 was trying to create a new day with respect to the treatment of those coming in versus those in. They were trying to equalize treatment. Okay, can I just stop you there? And I appreciate that. But an important point is that Congress did define applicant for admission. That's a statutorily defined term. But they didn't define seeking admission. And you can't then, I don't think, jump to the conclusion that those are somehow synonymous. So I don't believe they are synonymous, and I'm not jumping. So what do they mean then? I mean, if you are seeking admission and you are an applicant for admission? So I think the answer is in section 1225A3. And 1225A3 says that all aliens, including alien crewmen, who are applicants for admission, and the key words, or otherwise seeking admission, et cetera, shall be inspected by immigration officers. And so I think the clear takeaway from that language, this or otherwise language, is that applicants for admission are a subset of those seeking admission. And this is, like, we cited cases from the Seventh Circuit, the Eleventh Circuit's Villareal decision, all of which, including now the Fifth Circuit, analyzing this exact text, which have understood that or otherwise language to create a catch-all relationship where that which comes before is understood. The logic of the sentence means that that which comes before is subsumed within the broader category that comes after. And so that logic applied here means if you are an applicant for admission, you are therefore seeking admission, right? So, you know, if... Isn't admission... I agree with Judge McKeown that seeking admission has not been specifically defined, but admission is defined in 1101A, right? And that's admission is lawful entry after inspection and authorization by an immigration officer. That definition, does it apply to both applicants for admission and those seeking admission? Yes. I would think so. So just to finish up my point on the or otherwise clause, I think that the takeaway from that language is to create a logical relationship between applicant for admission and seeking admission. And that means that the petitioner's argument that seeking admission requires that the alien being going out and doing something or engaged in some kind of affirmative act makes absolutely no sense. Because if you are an applicant for admission, that has... Whether what the alien is doing, trying to literally seek out admission, is totally irrelevant to the definition. A1 deems aliens who are arriving or present in the United States to be applicants for admission. Full stop. It's irrelevant what they are doing. And the logic of A3 shows that if you are an applicant for admission, you are seeking admission. How do you answer the position that for 30 years, from 1997 to recently, the Immigration Service, as I always call it, because I remember it that way, the Immigration Service has applied 1226 to those people who are in the country and who have surreptitiously entered. So a couple of points on that. First of all, I want to distinguish between interpretation and practice. So we have cited in our brief regulations that were promulgated right after OIRA in 1997, which mirror the interpretation of the statute that we've put forward. So I don't think it's fair to say that the executive has always interpreted the statute in the way that it had been carried out for 30 years before. I think at the very start, there was an understanding, and the Fifth Circuit discusses this as well, an understanding of what the statute means, and nonetheless, the practice departed from that. But in terms of the 30-year practice, which Your Honor discussed, I don't think that ultimately carries the day. Obviously, I think when one looks at that, it's supposed to carry the inference that because it's been done so long, it necessarily is the way it must have been. I think the first line is statutory authority cannot evaporate just as a consequence of disuse. The Supreme Court said that in Bank America. And I don't think this is one of those circumstances where kind of like the dog that didn't bark argument really is strong. It is not as if the executive wasn't using 1225b2 to mandate detention before. It has always been understood to mandate detention. The question there is only scope. I want to go back and push back a little bit. You keep going back to legislation and ERIRA. And if you look at the legislative history on that point, what Congress said is it intended to restate the preexisting scheme of release on bond for an alien who is not lawfully in the United States. They said that very clearly in the House report. So what the legislation was doing was eliminating other disparities in this exclusion and deportation process. So Congress is very clear that enacting an ERIRA, that it's not somehow magically blessing or changing the scheme that if you were in the United States, you would be entitled to a bond hearing. So what do you make of that? Do we just disregard that? No. So I think a few things on that. I think, first of all, as petitioners try to do, they try to draw a distinction based on the legislative history between removal proceedings and detention, as if the legislative history itself was trying to draw that distinction. And I think that's a false distinction because the detention here is only in service of removal. I think Damore v. Kim and other Supreme Court cases have said that is why it exists. It facilitates the removal proceeding. So I don't think there's much to be read into the fact that it just refers to removal proceedings and doesn't single out detention by itself. But what it does do is it reinforces pretty clearly that even if you're an alien who's not lawfully in the United States, which is different from someone at the border, you're not in the United States yet, then you're entitled to a bond hearing. So I don't even think you need to get to legislative history. We want to go back to where you started, which was the statute. And what concerns me with your interpretation of the statute is that basically you have a situation where you're having the exception swallow the rule between 1225 and 1226. So then I say, okay, maybe I would credit your interpretation, but wouldn't that really render capital E superfluous, 1226C1E? Isn't that basically superfluous? Because you're saying, well, it would be an alien who was admitted in error or somebody. But if we take your interpretation of 1225, then it seems to me that 1226C1E is superfluous. Right. So that's what was added to the statute by the Lake and Riley Act. So I'll just say a few things about that. First of all, I don't think it means that there's no work being done. We've mentioned in our brief that there's still the restriction on parole, which preexisted the Lake and Riley Act. But the fact that subparagraph E is there and the grounds of inadmissibility are there would further restrict the executive's ability to release these individuals. So there's still work being done. But I also think the broader point with respect to the Lake and Riley Act is this. That was passed to the point about 30 years of practice. That was passed against the backdrop of 30 years of practice where the executive was not enforcing 1225B2A according to its terms. And so as far as Congress knew, that is what was going on. And so it responded to those 30 years by enacting the Lake and Riley Act. And so when it was passed, it was doing a lot of work. The trouble was that Congress had not been enforcing the law as written. So I don't think the candidate can surplus it. You mean the executive hadn't been enforcing the law as written? Did I say Congress? Yeah. Yeah, executive was not enforcing the law as written. So I think that really does kind of take a lot of the force away from the argument that it was surplusage. And I do think – I guess I'll leave it at that with respect to the Lake and Riley Act. One issue that had been raised in an amicus brief by Mr. Wells was – it raises the question of assuming the government's position here is correct, what about people who have already been released on bond under 1226? Does the government have a position on that? As to whether they can be re-detained under 1225. Correct. I think it's presented in this case, but I'd like to know if the government has a position on that. My understanding, though limited, is this, that there is – I think there's a BIA policy in place. It's not policy. A BIA decision in place which requires changed circumstances and the like. I do think there is litigation ongoing about whether that's still good law and whether re-detention can occur. So I don't really know a firm answer. It may well be that if they have been let on a bond, they can be re-detained. The circumstances of the alien has changed and that is relevant to being re-detained? Is that the BIA position? I believe at some point in the past that was. I'm not an expert on it, so I don't want to say something that's wrong, but that was my understanding. But as to the current class members, it is my understanding that we have this declaratory judgment, but despite that, the government policy hasn't changed in terms of mandatory detention? The government's policy has not changed in terms of mandatory – Has the government's practice changed? The government's practice has not. So what was – So basically the declaratory judgment has no effect according to the government? Well, what was occurring was aliens would go and get a bond hearing, but the BIA had in place its decision, the Hurtado decision, which adopts the interpretation of the statute that we advocate, and IJs are bound by BIA precedent. So that was the issue there, and so that resulted in habeas petitions being filed in district court. Well, maybe the better way to ask it than when I first did is that despite the declaratory judgment that basically said that there isn't a mandatory detention, the government's position is the only way for a petitioner to seek relief is through habeas. Is that right? Yes, so long as the IJs were bound by the BIA precedent. Right, okay. And that then has resulted in these thousands of habeas petitions being across the country, correct? Right. Can I reserve my time? I'm happy to answer any questions. Yeah, we'll put five minutes on the clock for rebuttal. Thank you. Okay, thank you. Mr. Adams, good morning. Good morning. May it please the court, Matt Adams with Northwest Immigrant Rights Project on behalf of plaintiff and class members. Defendant's new interpretation is contrary to the statutory scheme, congressional understanding of the statutes Congress enacted, and 30 years of practice. Defendant's policy decrees that all persons who are inadmissible are subject to 1225B2A, but that is plainly contrary to the statutory scheme. And that is clear because section 1226 expressly addresses inadmissible persons, not just deportable persons. So if you look at 1226 in subparagraphs C1A. What's the difference between being inadmissible and being deportable? The difference is a deportable person is someone who has already been admitted. So they were admitted at the border, whereas an inadmissible person has never been admitted at the border. And neither have right to remain. And both are subject to grounds of removability. So in that they have common interests. That is right. And so they're both placed in removal proceedings. And what Congress did in 1226C is said for those persons who are inadmissible in subparagraphs A, D, and E, they are not entitled to the bond hearing that they would otherwise receive under 1226A. In contrast, it's specified deportable persons under subparagraphs B and C, making clear that 1226 encompasses both deportable and inadmissible persons. Right. So then the argument is, you know, if all we had was 1226, then it would seem that your clients would be entitled to bond hearings. But then we have this other provision, which the government says is the more specific one in B2A. And two points I'd make on that. One, I don't agree that it's the more specific. In fact, 1226C1E is the one that specifies persons who are inadmissible under 1182A6A, which is those who are present without admission. That is class members. Whereas 1225 is specifying a different group, those who are seeking admission. And as Judge Bea earlier noted, admission is defined by the statute at 1101A13A as seeking lawful entry into the United States after examination by an immigration officer. Seeking lawful entry, not unlawful entry. That is correct. But it maintains the position of seeking entry into the United States. It's still tied to entry. And what you have— Not to presence. I'm sorry? And not to presence. That's correct. And not to presence. And, of course, that's consistent with this Court's holding in Torres v. Barr where the en banc decision made clear that the term of art, applicant for admission, is distinct from other terms like even application for admission because an applicant for admission is defining a legal status, whereas an application or seeking to apply is looking at an action. But isn't someone who is an applicant seeking admission just by operation of law? The term applicant for admission is a deeming provision. But Torres v. Barr warned that that cannot be equated with any reference to an application for admission. And, in fact, here it's even more clear because, again, admission, when you're seeking admission, requires, as the district court correctly found, an action. It's a present tense active verb. Those who are seeking entry into the United States. But what if Congress says we define everybody who is an alien as an applicant for admission and we use the same content for admission as applicant for admission and seeking admission, which is seeking lawful entry into the United States? But it's clear that those two terms are not synonymous because admission is, as you say, lawful admission into the United States, whereas applicant for admission encompasses any alien who's arriving at the border, whether with status or without status, and those who are present who have not been admitted. Maybe another way to ask it, I guess, is what do you think B-2A does cover? B-2A addresses those individuals who are seeking admission or seeking to enter the country who have not, where an immigration officer is determined they're not entitled, or clearly and beyond a doubt, entitled to be admitted. So it's all about persons who are encountered at the border who are then found not to be admissible. Those individuals. And they are automatically subject to detention, correct? They are subject to mandatory detention in that they are not entitled to a bond hearing. And this is consistent with the statutory framework that has been in effect since the 1890s as laid out in detail by the amicus brief submitted by the legal scholars, that there is a distinction between those encountered at the border and those who are already residing within the country. I guess the question is, did the 1996 statute try to remove that distinction through its construct of applicant for admission as somebody who's arriving in but who also is just in the United States? And I would submit that it's clear that it did not because where Congress sought to expand detention, it did so clearly in 1996. And if you look at Ira Iyer, where did it expand detention? It enacted 1226C, which specified groups of inadmissible persons who because of enumerated crimes would thereafter be subject to mandatory detention. And in addition, Ira Iyer implemented the new expedited removal scheme dealing with recent entrance into the country. And that is where beyond those held at the border, it created an additional space that mandated detention of recent entrance that they should be placed in the summary removal preceding expedited removal and should be held in custody. Are they considered applicants for admission? Yes. Individuals who are subject to expedited removal are applicants for admission. Who would be, if B-1 is expedited removal and covers this group of people, what does B-2A cover that's different than B-1 in your estimation? B-2A, as the Supreme Court explained in Jennings, is the catch-all phrase. So in B-1, they're focused on individuals who are apprehended and have false papers or made a misrepresentation, other individuals who have someone else's documents. It also encompasses individuals who are crossing between the ports of entry. And Congress empowered the agency to place those individuals into expedited removal. But for those who are inadmissible for other reasons, so on every day of the week, thousands of people present themselves at airports, at the border. They might have asylum. They might have lawful permanent residence status or a nonimmigrant visa. Many of those have a disqualifying criminal conviction. Are those B-2 people? Those are B-2 people. Some stayed outside of the country for too long, and so they become B-2 people. An asylum, a person who has asylum status, might have gone back and visited their home country, again, placing their asylum. Is this only at ports of entry then? It is not only at ports of entry, and that's the language that applicants for admission does because you still have individuals who are seeking to cross between ports of entry. And if they're apprehended crossing between the ports of entry, they're also not only deemed an applicant for admission but are seeking entry. Now, it wasn't lawful when they started, right? They're seeking entry between the ports. But when they're apprehended and they're not granted voluntary withdrawal under 1225A4, they're moving forward with their application to remain in this country, and they are deemed an applicant for admission who is seeking admission and subjected to detention under 1225B2A. Thus, Congress maintained a consistent framework of detaining individuals that were apprehended at the entry as opposed to those who are already in this country. And, of course, that is consistent with congressional understanding. When they enacted these provisions in 1996, the congressional findings showed that they estimated there were 2 million individuals in this country who had no lawful status. Hundreds of thousands of those who had been living here for years with no criminal record and many who had U.S. citizen family members, many had homes, Congress made no determination that it would take a drastic change and strip those individuals of their right to a determination, an individualized determination of whether that person should be uprooted for their family, from their homes, from their employment for months on end while they go through the removal process. And this is further illustrated by the fact that when Congress did expand detention, as it did in 1226C, it recognized the strain that would place on the agency. It gave the agency up to two years to gear up with the resources for what was a modestly, a relatively modest increase in detention compared to, under defendants' interpretation, this exponentially larger mandate of detention for every person in the United States who is here having lived here without previously being admitted. A couple questions that relate to the questions that I asked for the government. When I asked them about this legislative history, which you referred to in a different sense, where they said, well, we're not trying to upend the pre-existing scheme on aliens who can get bond but are in the country. They said, well, that really related to a different situation. That related to removal and deportation. And that's not the situation we're talking about so that this legislative history should be ignored, basically, because it doesn't reinforce the existing process. What's your position on that? Well, I think that's just plainly wrong. As I believe Judge McHugh and you cited from the conference report reconciling the bills, the congressional report stated that this new provision at 1226A, quote, restates the current provision in Section 242A1 regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States, end quote. It's hard to be more clear that Congress was maintaining the same detention framework that it had before. After I asked him that question, though, he then pointed me to another provision, and there are many provisions to look at here, admittedly, and that's the otherwise provision. I'd like to hear your position on the otherwise provision. Defendants ride back and forth on 1225A3, but that horse does not take them to the well. First of all, that statute is not addressing detention. It's a separate requirement dealing with inspection. But perhaps more importantly, that statute again illustrates the fundamental flaw in their argument, in their justification for discounting seeking admission. They repeatedly assert that an applicant for admission is necessarily seeking admission, and that is absolutely wrong. Applicant for admission is defined at 1225A1 to include any alien who is arriving to the United States. Now, this includes lawful permanent residents who are returning from trips. This includes parolees. This includes a crewman. All of those categories by statute are defined not to be seeking admission. We need look no further than the statute at 1101A13C makes clear that generally a returning lawful permanent resident is not deemed to be seeking admission. It says that explicitly. 1101A13B says that parolees are not deemed to be admitted. Crewmen are not deemed to be admitted. All of these are categories of applicants for admission who are not seeking admission. And yet defendants time and time again assert that it's crystal clear, and that's why they cite to 1225A3. You see that in the introduction of their reply brief, talking about how it's crystal clear that every applicant for admission is seeking admission, and that's just wrong on its face. It's plainly undercut by the statutory definitions at 1101A13, and it's further undermined by the statute itself when it permits, for example, in 1225A4 applicants for admission to withdraw their application. So if you have someone who comes to the border or arrives at the airport and the deportation or the immigration officer says, well, I don't think your visa is in order because you're here for a temporary visa, and yet I see that you've been working, they can be allowed to withdraw their application and get back on the plane and leave. That happens at the Canadian border. And it happens at the Canadian border and the southern border. So all of those, if defendants, I'm sorry, if respondents were correct, those individuals would be subject to 1225B2A because they're applicants for admission. But the distinction is once they withdraw their application, they're no longer seeking admission. And so they're not subject to that regime. They're not required to be detained. I mean, I think the government says, look, there are other ways to seek admission beyond being an applicant for admission. Right. But they also say every applicant is seeking admission. They basically say they're synonymous, though, in large part. They often say they're synonymous. But, for example, I'll just read from their introduction on the first page of their reply brief. Most notably, plaintiffs disregard the import of 1225A3, which makes crystal clear that all applicants for admission are necessarily seeking admission. That's wrong. There are many categories of applicants for admission who are not seeking admission. And that, again, they use that to justify this blinders, this approach of 1225B2A where they read applicant for admission in a vacuum and they disregard the rest, the remaining part of that provision, which states not just that an applicant for admission, but rather that an applicant for admission who is seeking admission. And who are those people seeking admission? That's where Congress has qualified which applicants for admission are subject to 1225B2A. Congress limited it to those who are seeking admission. And only those who are seeking admission are then subjected to 1225B2A. And, again, this is consistent with 1226. And earlier there was discussion about the Lake and Riley Act. But I want to point out that since the date of its enactment, 1226 has included inadmissible persons. Since September 30th, 1996, when IRIR was enacted, it included the subparagraphs C1A and C1D, two categories of inadmissible aliens who, because of enumerated offenses, were then disqualified from being eligible for release under 1226A. And so this conflict under defendant's interpretation has existed from the very get-go. And, again, it's important to understand that 1226C is not an independent source of authority. Defendants try to give it meaning by saying, well, maybe Congress wanted to make doubly sure that someone who is subjected to 1225B2 should not be released on parole. But as the Supreme Court held in Nielsen v. Priyip, 12256C is simply a limit on the detention authority provided by 1226A. And the Supreme Court reaffirmed that in Jennings, saying that 1226C simply carves out a category of inadmissible persons who would otherwise be eligible for release on bond under 1226A. In response, I asked about Jennings, as you know. But the government's response is, well, Jennings isn't this case, and we know that. Otherwise, we wouldn't be here. But the government says that we really can't make anything of the distinctions that are drawn there between those who are in the country and those that are seeking admission. There are several other cases, but what do we make? They call it dicta. You call it what? It's certainly not dicta. If you look at Priyip v. Nielsen, that was a holding central. I mean, that analysis and that holding was central to its opinion because it was making a determination of whether an individual could be subjected to mandatory detention if they were not initially apprehended at the point they had been released from criminal custody. And the Supreme Court rejected the analysis of the underlying Court of Appeals, and it said that 1226C1 is not a standalone source of authority. Instead, it's limited to the authority, and it's directly tied to the detention authority provided by 1226A. So its holding was clear, and that was not only clear, but it was central to the analysis in Priyip v. Nielsen, and that was reaffirmed in Jennings v. Rodriguez, where it talks about it as a carve-out. And again, Congress is presumed to understand the statutes they enact or amend, and if indeed it had been their intent to double down and restrict people from being released on parole under 1225B2A, then it would have amended 1225B2A, or it would have amended the parole statute at 1182D5, as that parole statute already includes groups that are restricted from being released on parole. I want to ask you about redundancy because both parties have talked about redundancy in their briefs. And if you would give us your position, but as I read the government's brief, they're saying, well, even if there's some redundancy, that there are a few areas where you could carve out an independent effect of what you would argue would be redundant language in the statute. What is your response? My response is that we're not talking about a simple redundancy, but instead, as Judge Douglas said in her dissent in the Fifth Circuit, we're talking about taking a sledgehammer to the statute because under the government's interpretation, they are nullifying entire provisions, entire subparagraphs of the statute, not just from the Lake and Riley Act, subparagraph E, but also from the original enactment, subparagraphs A and D. In addition to that, they were also then ignoring and rendering superfluous the term seeking admission within the very statute which they purport to apply. And they also ignore the remaining language in that statute, which talks about a determination by an immigration officer, whether that person is clearly entitled to be admitted. These are all actions that are occurring when people are seeking lawful entry into the United States. These are not actions that occur when an immigration officer arrests someone in the interior. If someone is apprehended at the street, the immigration officer does not determine whether they may be admitted there in downtown Seattle. No, they then make a referral, finding that they're here in violation of the law, and make a referral to immigration proceedings before an immigration judge, who under the statute is exclusively entitled to make an admission determination at that point. And you see that in 8 U.S.C. 1229, subparagraph A3. Again, this all is focused on its context, and defendants are ignoring the context of what 1225b2 is. Those individuals arriving at the border who are found not to be admissible, those are the ones maintaining the same statutory framework that has been in effect since the 1890s, contrasting individuals arriving at the border with those who are already in the United States. What language in the B2A would you most rely on for the kind of border nexus of the position? The clearest language is that seeking admission. So it says that in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted. So it's all about being admitted and seeking admission. And by definition at 1101 A13A, admission is lawful entry into the United States after the examination by an immigration officer. Would this cover people who do not enter at a port of entry? It would. How is that person seeking lawful admission under your definition? Because even though they might be attempting to surreptitiously enter, they're apprehended at the border, and at that point, instead of withdrawing their application and returning, they're pressing forward, whether it's a claim for asylum or they have some other defense that they want to make in whether it's expedited removal proceedings or standard removal proceedings under B2A, they're pushing forward with their application. So why wouldn't we characterize your clients as similar? They weren't apprehended at the border, but nonetheless, they've been detained, and they're now seeking admission. But they're not seeking admission because their admission is tied by definition to entry into the United States. They have already entered, and that is consistent, again, with a framework that has continued for over 100 years. So the defendants' counsel referred to it as an entry fiction, and that's completing two separate concepts. We're not talking about the entry fiction. We're talking about entry itself, and the definition of admission includes entry. So it did not do away, IRA-IRA did not do away with entry as being a key component. Instead, it included that within the definition of admission. And, of course, there's case law, both with the agency, the Ninth Circuit, and other circuits that talks about when does someone affect an entry if they're arriving between the ports. And so that's both in the criminal context and the civil context, and it's a three-factor test, and it talks about whether they're free from constraints when they were entering. So an entry can still be affected in between the ports. And if they're apprehended without successfully making an entry, then they're subject to mandatory detention. How do you get to the United States without going through a port or between ports? Through a drone or something? I mean, you just get dropped in? I mean, is there an actual example? Well, I think maybe I must have misstated something because I don't ‑‑ I'm not asserting that there's a third way. You're either coming in through a port of entry or between ports of entry. There's not some way you get parachuted in, so to speak. No, that's not what I believe. We're still thinking on some people's part. Contemplating. Can I ask your position on this portion of the regulation that's been in place since, I think, 1997 that does seemingly reflect the government's position on this? What do you make of that? Yes, I do agree that that regulation, from our perspective, is confusing because it does have language that would support the government's position. But at the same time, the enacting regulations also had language which explicitly stated that applicants for admission would continue to receive bond hearings, to be entitled to bond hearings. And again, and then you also have 8 CFR 1003.19H2, which specifies that only arriving aliens would be ineligible to get a bond hearing before an immigration judge. So there is conflicting language in the regulations from the date of enactment. But what is clear is that the regulatory language also supports and explicitly supports plaintiffs' position that they continue to be entitled to bond hearings, and that, in fact, was the practice for 30 years. And I'd make one final point on that. Even though now the agency wants to walk back from that practice of 30 years, but the fact that they had that consistent practice from the date of enactment 30 years ago is also instructive as a standard canon of statutory interpretation in looking at what Congress did in the Lake and Riley Act, where they again adopted or amended 1226C with respect to inadmissible persons. So the fact that Congress understood 1226C to be applying to inadmissible persons is reinforced by the agency practice and supports plaintiffs' position and directly undermines defendants' new interpretation. The government says in response, you know, well, the state of play was at the time that there was non-enforcement or under-enforcement of B2A, so it's hard to know what to make of the Lake and Riley amendments against that backdrop. What do you think of that point? I think to the contrary. If Congress thought that the government had it wrong, the executive branch had it wrong, then they would have clarified that no, 1226C does not apply to inadmissible persons. But instead, Congress doubled down on 1226 application to inadmissible persons, creating yet another category of inadmissible persons who would otherwise be entitled for a bond hearing under 1226A, but instead carved them out in 1226C1E. And again, it's notable that the Lake and Riley Act did not even address deportable persons. It was focused solely on inadmissible persons. All of this reinforcing that the district court was correct in finding that these statutory exceptions prove that absent the exception, the statute applies. And of course, the district court relied on the Supreme Court's decision in Shady Grove. And this again goes back to your original question, Judge McKeown, about whether there's some redundancy. This is not simple redundancy. This is nullifying complete subparagraphs of the statute. And it's not just the subparagraphs. If you look at 1226A, the predecessor statute used language that said penning a determination of deportability. But then with IRA-IRA, Congress changed that and said penning a decision of removability, making clear that it's inclusive of both categories, not just deportable persons but also inadmissible persons. So from the get-go in 1226A, it specifies that. And then in 1226C, it makes it absolutely clear that 1226A encompasses both deportable and inadmissible persons because it has different subparagraphs that exclusively address one category or the other, both whether it's inadmissible or deportable persons. I have one question briefly on enforcement. You raised the issue, but you don't ask for any relief other than a quick ruling? That's right. At this point, we're simply asking this court to rule as quickly as possible. We have gone before the district court ad nauseam with repeated habeas petitions because the government has refused to acknowledge evidently that they're a party to the declaratory judgment. Those immigration judges are a party, and so when they say they're bound by the BIA decision, it makes no sense because the declaratory judgment is final. And under rule of law, an Article III court's finding in which they're a party is controlling, but they've been disregarding that. Thank you. We have the Fifth Circuit decision. I know the Eighth Circuit heard arguments recently. Are there arguments scheduled in any other court of appeals that you know about? There are, I believe, in the First and Fourth Circuits, and, of course, the Seventh Circuit already issued a ruling on this in the preliminary injunction stage, and there's been arguments that are pending a decision there at the substantive stage as well. We've obviously understandably gone over time here, but I want to see if colleagues have additional questions for you. No. Mr. Adams, thank you. Thank you for your time. Just a few points in response, Your Honors. Just picking up on Jennings, I think I've made the point that I think it is dicta, but to the extent that we're going to look at Jennings for language that is helpful, I think it actually has helpful language to both sides. So, for example, on page 297 of Jennings, the court in the analysis, not the background section, says, read most naturally sections 1225B1 and B2 thus mandate detention of applicants for admission until certain proceedings have been concluded. So I think you can find some language that's perhaps helpful to their side. You can find some language that's helpful to our side, all of which I think goes to show the instruction from pork producers. They're not supposed to parse dicta in decisions like it was a statute. But I'll leave Jennings there. I wanted to make a point about section 1225A3. As far as I recall, my friend on the other side didn't dispute that the function of an or otherwise clause, he hasn't identified any other statute that has read such language or any other court rather that has read such language differently. His whole argument, as I understand it, was, well, there are some people who don't fit into that category, and it's not surprising at all. He pointed to 1101A13A. Congress is perfectly capable of taking a rule and having exception to it. That doesn't negate the logic of the provision that Congress was putting into place that applicants for admission are seeking admission. And none of the class members, to my knowledge, fall into any of those exceptions, so that doesn't do them any good either. Which exceptions are you referring to here specifically? So he had mentioned, I think, stowaway. I think he had mentioned the exception or the reference in 1101A13A referring to LPRs. And there might have been another one that I don't recall. But the point being that none of that negates the logic of the language in 1225A3 showing that those who are applicants for admission are seeking admission. Are there other people who are seeking admission who are not applicants for admission? Yes. Right. So one example that comes to mind is there are some inspections done in foreign airports in Dublin or Vancouver, to my knowledge. And those people are inspected. These will be aliens coming to the United States. They are not applicants for admission because they are not arriving here, and they are certainly not present here. But then a pre-inspection is being done there. They're seeking admission, no? Right, but they're not applicants. Seeking admission at what is tantamount to a border. I mean, the arrangement with these special airports is basically having a tantamount to a border inspection, right? But they are not arriving in or present in the United States. And that is the definition under applicant for admission. So those people could be deemed to be seeking admission, the broader category, but not applicants for admission. So I think the logic of 1225A3 holds, but the more important point being that applicants for admission are seeking admission. I did want to address the consequences of the interpretation of seeking admission that the other side puts forward. So as I understand their position, there's a few things that confuse me. I thought I heard my friend say that if an alien comes between the ports of entry and says they are applying for asylum or something like that, they are therefore deemed to be seeking admission. That sounds a lot like our alternative argument for why they would be seeking admission if they're seeking some other relief when they are in the country, for example, in removal proceedings, which I thought they had said was not seeking admission. So I think there's some inconsistency in their position there. I think a broader point is a sort of a practical one. How are we to know if, especially when you're talking about between the borders, in any given case, whether an alien who has crossed the borders, crossed between ports of entry, whether in any given case, what that alien intended to do? Did they intend to find a border patrol agent and apply for asylum or some other kind of relief or not? I have no idea under their interpretation of the statute how that would be determined, and it sounds like we just have to take the alien's word for it. I'm not sure if that involves an evidentiary hearing. None of that seems to be called for in the statute at all. And if there are going to be presumptions in place, like objective presumptions about, well, they made it 100 miles in, so we don't think they're seeking admission, maybe we can do that. But the statute doesn't lay any of that out either, which I think strongly suggests that this is not what the statute was intended to put in place. The regulations do speak to that, though, right, in terms of distance from the border and practices? I'm not sure which regulation. I know under expedited removal there's some of that, but I'm not sure under 1225b2a. I think another really important consequence of their interpretation to keep in mind is this, that the entire incentive structure that it creates is to encourage aliens to violate the immigration laws. That is the inevitable consequence of their interpretation is no one would say I am seeking admission. I am coming here to obtain lawful entry in the United States because the consequence of that would be mandatory detention. So what their interpretation does is push aliens to evade inspection by immigration officers, which also just happens to put them in violation of 8 U.S.C. 1325a, the unlawful alien provision, which is a misdemeanor. It's very hard for me to believe that the Congress that passed OIRA of all things, which was a very strict border security provision, was trying to put in place a system to encourage with a pretty heavy stick mandatory detention aliens to evade the immigration laws of the United States. I don't think that's plausible. I have 39 seconds left, so I guess— You're in borrowed time here, but I want to make sure that all of our questions are asked. Why don't you go ahead and make a concluding statement? I guess what I just say, Your Honor, is we hope the court will reverse, and I will echo my friend's request that the court act expeditiously. Thank you. Thank you. Mr. Hayes, Mr. Adams, we thank you and your teams for the helpful briefing and argument. This matter is submitted. We'll stand at recess until tomorrow morning. All rise.
judges: McKEOWN, BEA, BRESS